# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORMA MORENO, | Case No. 1:19-cv-01470-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL AND DIRECTING CLERK OF COURT TO CLOSE ACTION |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 18, 19) |
| Defendant. | |

## I.

## INTRODUCTION

Plaintiff Norma Moreno ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from diabetes mellitus; inflammatory arthritis of the back and knees; degenerative disc disease; hypertension; and obesity.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

/ / /

---

[1] The parties have consented to the jurisdiction of a United States Magistrate Judge.  (See ECF Nos. 7, 8.)

## II.

## BACKGROUND

### A.    Procedural History

On March 17, 2016, Plaintiff filed a Title II application for disability insurance benefits, alleging a period of disability beginning on December 31, 2013.  (AR 183-89.)  Plaintiff's claim was initially denied on May 18, 2016, and denied upon reconsideration on September 13, 2016.  (AR 100-104, 138-42.)   On September 28, 2016, Plaintiff requested a hearing before an Administrative Law Judge, and on July 24, 2018, Plaintiff appeared via videoconference with counsel before Administrative Law Judge Robert Milton Erickson (the "ALJ") for a hearing.  (AR 35-69, 106-107.)  A medical expert and a vocational expert presented testimony.  (AR 35-69.)  At the hearing, Plaintiff amended her alleged onset date to October 1, 2014.  (AR 40.)  On September 27, 2018, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 14-34.)  On August 22, 2019, the Appeals Council denied Plaintiff's request for review.  (AR 1-6.)

Plaintiff filed this action on October 17, 2019, and seeks judicial review of the denial of her application for disability benefits.  (ECF No. 1.)  On July 6, 2020, Plaintiff filed a brief in support of remand.  (ECF No. 18.)  On August 5, 2020, Defendant filed a brief in opposition.  (ECF No. 19.)  Plaintiff did not file a reply brief.

### B.    Hearing Testimony

Plaintiff testified at the July 24, 2018 hearing via videoconference and with the assistance of counsel.  (AR 37-38.)  The ALJ inquired about certain records that Plaintiff and counsel had not yet been able to obtain, and the ALJ told counsel to notify the ALJ at the end of the hearing if counsel needed additional time to obtain the records.  (AR 39.)  The ALJ introduced the medical expert Dr. Harvey Alpern (the "ME" or "Dr. Alpern"), and the vocational expert David Dettmer (the "VE").  (AR 41.)

The ALJ first confirmed that Plaintiff was insured for disability indemnity through June 30, 2019, and thus that was not an issue in the claim, and the issue of the claim before the ALJ was whether at any point from December 31, 2013, to the present, Plaintiff met the criteria for benefits under the Social Security Act using the five-step evaluation process.  (AR 40.)  Plaintiff

amended her alleged onset date from December 31, 2013, to October 1, 2014, which was seventeen (17) months prior to the application date.  (Id.)  This would make Plaintiff fifty-seven (57) years old on the amended alleged onset date.  (AR 41.)

Plaintiff testified that the only time she worked since October 1, 2014, was a couple of months in 2016 taking care of her mother through in-home support, for about 40 hours per month until her sister took her mother to move in with her.  (AR 42.)

In 2002, Plaintiff was working for San Joaquin Valley Pulmonary Group as a medical insurance biller.  (AR 43.)  Plaintiff would sit for almost the entire eight-hour workday performing keyboard data entry.  (Id.)  Plaintiff took one medical billing course during her time at Bakersfield College, which she attended between 1975 and 1977.  (AR 44.)  Plaintiff recalled the software used was not exclusive to the company, but more of a generic billing program.  (Id.)  The heaviest items Plaintiff lifted at this position were file boxes that weighed up to about twenty (20) pounds.  (Id.)  Plaintiff's job title did not change between 2002 and 2013.  (AR 45.)  Plaintiff left for "stress leave" after the new administration changed the job to cover what three people were doing previously, and when Plaintiff returned, she was given a different duty of sending out mail.  (AR 45-46.)  She did the mail-checking duties for about two months.  (AR 46.)  The ALJ stated she would not consider this two-month period, noting to the VE that Plaintiff only had one job title.  (Id.)

Plaintiff graduated high school and attended three years of junior college, but has not attended other job-specific schooling or classes.  (AR 47.)

Plaintiff has not filed any workers' compensation from 2002 until the hearing date.  (AR 47.)  The ALJ inquired as to why Plaintiff was amending her alleged onset date, and asked whether there was any increase in symptoms around March of 2016 that led her to file the application then and not earlier.  (AR 47.)  Plaintiff answered that she just kept putting it off hoping she would feel better, but Plaintiff never felt better, and then she had to deal with a difficult death of someone in October of 2015 and Plaintiff just could never get back on track.  (AR 47-48.)  The ALJ asked whether there was anything that Plaintiff could do before the death that she couldn't do after, and Plaintiff answered no she was just trying to get healthy and then

the death happened and she never could.  (AR 48.)

Plaintiff confirmed she had a driver's license at some point since October 1, 2014.  (Id.) Plaintiff answered that to her knowledge, since October 4, 2014, no treating doctors had contacted the Department of Motor Vehicles to have Plaintiff's driver's license suspended or limited in any way.  (Id.)  Plaintiff confirmed that she had been living in Bakersfield, California, since October of 2014, and that the furthest she had driven since then was maybe Los Angeles, California.  (Id.)  Plaintiff would not drive without stopping, and usually stopped in Castaic, California, about one hour away.  (AR 49.)  Plaintiff would stop at that point because her knees would get too stiff and lock up.  (Id.)

Plaintiff has two pet dogs that she sometimes feeds but she is not the only caretaker for the dogs.  (AR 49-50.)  Plaintiff testified that usually the bag of dog food is fifteen or twenty pounds, but Plaintiff is not the one that buys and lifts it at the store.  (AR 50.)  Plaintiff usually doesn't have to lift the bag at the house but will drag the bag if she has to.  (Id.)

Plaintiff does not walk her dogs because she can't walk with her knees.  (Id.)  Plaintiff does not walk for exercise, but does a small routine inside the house sitting, and tries to work her legs.  (AR 51.)  Plaintiff has not gone to a shopping mall since October of 2014, but has gone to Walmart, where she can walk for about thirty (30) minutes, but her knees give her difficulty immediately, and she has the basket to hold onto.  (Id.)

Plaintiff lives with her husband.  (Id.)  They both do the cooking.  (Id.)  When Plaintiff cooks, she prepares items that she can make part of earlier in the day, then finishes in the last part of the day right before her husband comes home.  (AR 51-52.)  Plaintiff sometimes has problems cutting food, and her thumbs on both sides are stiff making it hard to grasp the knife. (AR 52.)  Plaintiff testified it had been at least five (5) years since she first had tension in the left shoulder and that was part of the problem of grasping the knife.  (Id.)

Plaintiff has rarely used a computer since October of 2014.  During the last two years she was working Plaintiff really only used the right hand and didn't use the left hand.  (Id.)  Plaintiff has a cell phone that she uses sometimes for social media, but not often.  (AR 52-53.)

Plaintiff has no grandchildren.  (AR 53.)  The ALJ asked if Plaintiff goes to any

community events, or things such as concerts or fireworks, and Plaintiff stated she doesn't strictly stay at home, but sometimes goes out, such as a recent dinner concert where she was seated for about thirty minutes.  (Id.)  Plaintiff was able to stay seated for the thirty minutes but was shifting in the chair.  (Id.)  Plaintiff answered that she had not attended any church events since October of 2014.  (AR 54.)

The medical expert then testified.  The ALJ prefaced her questioning with a statement concerning the amended alleged onset date.  (Id.)  The ME testified that there were no clinical studies in the record that substantiated a diagnosis of Lupus, but readings for a rheumatologic condition suggested, and medications were given.  (AR 54-55.)  The ME stated what "we are talking about is just a general problem."  (AR 55.)  For the time of October 1, 2014, until the hearing, the ME diagnosed poli arthropathy, as well as obesity, diabetes, and suggestion of degenerative disc disease of the neck, back, and knees.  (Id.)

The ALJ noted treating physicians were considering the possibly of Shingles, and the ME confirmed this was mentioned but that there were no clinical studies establishing that Plaintiff had Shingles.  (Id.)  The ME also confirmed there were no clinical studies establishing hyperthyroidism, noting the referenced exhibit did discuss knee and back problems.  (Id.)

The ALJ asked if based on the ME's review of the exhibits 1 through 16F, if with reasonable medical probability at any point from October 1, 2014 to the present, would Plaintiff meet the criteria of any listing.  (Id.)  The ME answered that they considered 14.09D pertaining to rheumatory inflammatory diseases, but it is hard to equal that listing because of the lack of precise dates.  (AR 56.)  The ALJ asked about 1.02 or 1.04 for the degenerative disc disease or degenerative joint disease of the knees, and the ME testified that they could not find enough for either listing, but then went back and stated "she could probably equal 14.09D because of the combination of problems if you take them altogether."  (Id.)  The ME stated this was considering the rheumatoid factor is elevated when combined, and Plaintiff has problems with multiple joints.  (Id.)

The ALJ then asked if at any time since October of 2014, whether Plaintiff could perform a light exertional demand job, such as lifting occasionally twenty pounds; frequently lifting ten

pounds; standing or walking six hours of an eight-hour workday; and sitting six hours of an eight-hour workday. (AR 56-57.) The ME responded that they considered that, and put 20/10 two in the notes, which describes sedentary work. (AR 57.) The ME confirmed this included standing and walking only two hours in an eight-hour workday, siting six hours, and occasional postural exertion but no climbing ropes or ladders. (Id.) As for the basis for limitations of the upper extremities, the ME referenced degenerative disc disease of the cervical spine. (Id.) When the ALJ asked if this would preclude reaching in any direction, the ME stated probably no overhead. (Id.) The ME stated there were no environmental limitations. (AR 58.)

The ME was then examined by Plaintiff's counsel. (Id.) Counsel asked for an opinion regarding limitations on the range of motion of the neck, for example whether Plaintiff would be limited to lateral moving of her head side to side to occasional or rarely. (Id.) The ME stated it is a possibility, but the ME did not see such limitations demonstrated. (Id.)

Counsel asked the ME when considering reports of pain or physical examination findings, as well as prescribed medications, whether Plaintiff would be able to sustain concentration or focus on complex tasks. (Id.) The ME testified that the medicines were not opiates but rheumatologic as far as he knows, so they would not effect Plaintiff in that regard. (Id.) Counsel asked about drowsiness or limited stamina, and the ME stated only from what the Plaintiff testified regarding shortness of breath, that is part of her limit. (Id.)

The ALJ then asked that given problems of shortness of breath, whether there should be limitations to exposure of fumes, odors, and gases. (AR 59.) The ME confirmed Plaintiff should avoid concentrated exposure to fumes, odors, and gases. (Id.)

The ALJ also asked whether all of the limitations discussed would have existed as of October 1, 2014 or at some date thereafter, and the ME stated about that time. (Id.)

Plaintiff's counsel then asked the ME whether Plaintiff would need additional breaks in an eight-hour workday, the ME stated it was more likely than not. (AR 59-60.) The ALJ then asked whether given the two morning fifteen (15) minute breaks, the afternoon fifteen (15) minute break, and twenty (20) minute lunch break, whether additional breaks were needed. (AR 60.) The ME stated it is not clear from the record whether Plaintiff would need them. (Id.)

The VE then presented testimony.  (AR 60.)  The VE testified that Plaintiff's previous position as an insurance clerk is classified as sedentary.  (AR 61.)  The first hypothetical person presented was an individual who can lift or carry occasionally twenty pounds and frequently ten pounds; can stand or walk two hours of an eight-hour workday; sit six hours of an eight-hour workday; can never climb ladders, ropes or scaffolding; can occasionally climb ramps or stairs; can occasionally stoop, crawl, crouch, or kneel with bilateral upper extremities; occasional overhead reaching; and must avoid concentrated exposure to fumes, odors, gases, or pulmonary irritants.  (AR 61-62.)  The VE testified such person could perform the previous employment of an insurance clerk.  (AR 62.)  The ALJ asked about whether such job listing references reaching and specifically overhead reaching, and the VE testified it states occasional reaching but does not address overhead.  (Id.)  The VE testified that based on 40 years of experience, the overhead would not be more than occasional.  (Id.)  The ALJ then clarified that the hypothetical should have the individual take advantage of all normal work breaks, and the VE testified that would not change the analysis.  (Id.)

The ALJ then asked counsel whether any treating physician opined on Plaintiff's limitations, and counsel replied there did not appear to be such in the record.  (AR 63.)

The ALJ presented a second hypothetical person that can lift and carry occasionally ten pounds and frequently one to nine pounds; can stand or walk two hours of an eight-hour workday but no more than thirty minutes continuously; can sit for six hours of an eight-hour workday but no more than one hour continuously; can never climb ladders, ropes, or scaffolding; can occasionally climb ramps or stairs; can occasionally balance, stoop, crawl, crouch, or kneel; is limited to occasional overhead reaching with the bilateral upper extremities; and must avoid concentrated exposure to fumes, odors, gases and other pulmonary irritants.  (Id.)  The VE testified that such person could perform the previous employment of insurance clerk.  (Id.)

Counsel then presented an alternative hypothetical with the same limitations as the first hypothetical, but with the additional factor that the person is limited to simple, routine tasks, based on testimony of the difficulty of adjusting after the death of a loved one.  (AR 63-64.)  The VE confirmed that the insurance clerk position was not simple and routine, and thus that position

1   would not be appropriate.  (AR 64.)  The VE confirmed that such person would be limited to

2   simple routine, or unskilled work.  (Id.)

3       The ALJ then asked if such person were to come to the VE for vocational rehabilitation

4   purposes, whether the VE would be looking for unskilled light work, and the VE stated yes with

5   a simple routine restriction.  (Id.)  The ALJ also confirmed with counsel that such hypothetical

6   person would fall within the GRID, as they are 57 years old and limited to light work and cannot

7   perform past work.  (Id.)

8       Plaintiff's counsel then examined Plaintiff.  (AR 65.)  Plaintiff confirmed that the cane

9   brought to the hearing was prescribed by a doctor at San Joaquin Valley Pulmonary, about three

10  years prior in 2015.  (Id.)  This is where Plaintiff was previously employed, and where her

11  primary doctor practices.  (AR 66.)  Plaintiff confirmed she was also prescribed a walker with a

12  seat by the same office, after the cane.  (Id.)  Counsel asked if there was a reason why Plaintiff

13  didn't bring the walker to the hearing, and Plaintiff stated that she just uses that when she needs to.

14  (AR 66-67.)  Counsel then asked if Plaintiff had ever actually got the walker, and Plaintiff stated

15  no, she could not afford it, and had been relying on the cane.  (AR 67.)  Counsel then directed the

16  ALJ to a record dated September 18, 2017, that documented the prescription and order for the

17  walker, Exhibit 15F at page 29.  (Id.)

18      The ALJ then presented a third hypothetical person to the VE, based on hypothetical one

19  with an additional requirement that the person needs a walker in order to ambulate, and the VE

20  testified that such addition would not necessarily eliminate the ability to engage in employment

21  as an insurance clerk.  (Id.)  The ALJ acknowledged that there are other considerations in regard

22  to the use of a walker.  (Id.)

23      The ALJ then presented the same hypothetical person as the first hypothetical in addition

24  to a requirement that the person needs a cane to ambulate, and the VE confirmed that such

25  person would not be precluded from performing the employment of insurance clerk.  (AR 66-

26  67.)

27      The ALJ then granted fourteen (14) days for Plaintiff's counsel to submit the additional

28  records discussed at the beginning of the hearing, and the ALJ then closed the hearing.  (AR 68.)

## C.      The ALJ's Findings of Fact and Conclusions of Law

The ALJ made the following findings of fact and conclusions of law:

- Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2019.

- Plaintiff has not engaged in substantial gainful activity since the amended alleged onset date of October 1, 2014.

- Plaintiff has the following severe impairments: diabetes mellitus; inflammatory arthritis of the back and knees; degenerative disc disease; hypertension; and obesity.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

- Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except the individual: can lift or carry 10 pounds frequently and one to nine pounds occasionally; can stand or walk two hours of an eight-hour workday, but no more than 30 minutes continuously; can sit for six hours of an eight-hour workday, but no more than one hour continuously; can never climb ladders, ropes, or scaffolding; can occasionally climb ramps or stairs, and occasionally balance, stoop, crawl, crouch or kneel; can occasionally perform overhead reaching with the bilateral upper extremities; and must avoid concentrated exposure to fumes, odors, gases, and pulmonary irritants.

- Plaintiff is capable of performing past relevant work as an insurance clerk as such work does not require the performance of work-related activities precluded by the Plaintiff's residual functional capacity.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from October 1, 2014, through the date of the ALJ's decision, September 27, 2018.

(AR 17-29.)

/ / /

/ / /

/ / /

# III.

# LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five-step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[2] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

---

[2] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. § 404.1501 et seq., and Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq. The regulations are generally the same for both types of benefits. Further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a *whole*, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

**IV.**

**DISCUSSION AND ANALYSIS**

Plaintiff argues the ALJ erred by: (A) failing to properly evaluate the opinion of certified physician assistant ("PA-C") Pamela Caprioli ("Caprioli"); and (B) failing to consider the medical expert's testimony regarding Plaintiff's equaling listing 14.09D. (Pl.'s Opening Br. ("Br."), ECF No. 18.)

**A.      Whether the ALJ Erred in Evaluating the Opinion of the Physician Assistant**

Plaintiff argues the ALJ failed to provide germane reasons to reject the limitations assigned by PA-C Caprioli's opinion. While Plaintiff refers to Caprioli as a nurse practitioner, it appears Caprioli is a certified physician assistant. (AR 27, 584.) While the parties somewhat disagree regarding the applicability of certain regulations that are not ultimately determinative of any issues in this action (Br. 6; Opp'n 6), the parties appear to agree that in order to reject Caprioli's opinion, the ALJ was required to articulate reasons "germane" to the opinion.

To reject the testimony of a medically acceptable treating source, the ALJ must provide specific, legitimate reasons based on substantial evidence in the record. Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009)). Only licensed physicians and certain other qualified specialists are considered "[a]cceptable medical sources." Molina, 674 F.3d at 1111 (quoting 20 C.F.R. § 404.1513(a)) (alteration in quoting source). "Other sources," such as a physician assistant, are not entitled to the same deference as acceptable medical sources, and the ALJ may discount testimony from "other sources" by providing reasons germane to each witness. Molina, 674 F.3d at 1111 (citing 20 C.F.R. §§ 404.1513(a)-404.1527; SSR 06–03p; Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 (9th Cir.2010)).

### 1.   The Relevant Treatment Records

On June 20, 2018, Plaintiff presented to Caprioli for a new patient consultation for Polyarthralgia. (AR 587.) Plaintiff reported her symptoms were worsening; that she has joint pain throughout the day mostly in her shoulders, elbows, knees, ankles, and hands; that she is seeing Dr. Parmar for pain management but refuses narcotics, and has received epidurals in her back; that she admits to fevers and chills; that flares up occur more often in the summer time; that she has symptoms of fatigue; that her sleeping pattern is poor, secondary to pain; and admitted to abnormal hair loss and sun sensitivity. (Id.) On general exam, Plaintiff's general appearance was well developed, well nourished, and oriented, she had normal heart, normal lungs, normal abdomen, and a normal musculoskeletal exam with no visible synovitis present in the joints. (Id.) Caprioli assessed: (1) systemic lupus erythematosus, unspecified; (2) other intervertebral degeneration, lumbar region; and (3) other chronic pain. (Id.) Caprioli noted she would order additional blood work; x-rays of the bilateral hands, shoulders, elbows, and ankles; and would refer Plaintiff to aquatic therapy. (AR 588.)

The results of the imaging and testing ordered by Caprioli were largely normal or showed minimal degenerative changes. A June 20, 2018 test for HLA-B27 was negative, with the document noting that the presence of HLA-B27 antigen is strongly associated with ankylosing spondylitis and related disorders. (AR 597.) June 21, 2018 x-rays of the left and right shoulder

showed: (1) normal bones with no significant arthropathy or acute abnormality; (2) mild calcific tendinitis of the soft tissues; (3) negative for other findings; and (4) conclusion that the findings were consistent with mild calcific tendinitis, with an additional notation of "without acute pathology" on the right shoulder findings.  (AR 589-90.)  June 21, 2018 x-rays of both the right and left ankles: (1) showed plantar and dorsal calcaneal spurring of the bones; (2) were negative for soft tissue abnormalities with no visible soft tissue swelling; (3) showed no visible effusion and negative for other findings; and (4) conclusion of calcaneal spurring without acute pathology.  (AR 591, 596.)  A June 21, 2018 x-ray of the left hand showed: (1) normal bones with no significant arthropathy or acute abnormality; (2) negative for soft tissue abnormalities with no visible soft tissue swelling; (3) negative for other findings; and (4) concluding remark of "[n]ormal examination."  (AR 592.)  A June 21, 2018 x-ray of the right hand showed: (1) minimal osteoarthritic changes with mild involvement of the DIP joints particularly the second and third fingers, with no fractures; (2) negative for soft tissue abnormalities with no visible swelling; (3) negative for other findings; and (4) conclusion of minimal osteoarthritic changes as described.  (AR 593.)  June 21, 2018 x-rays of the left and right elbows showed: (1) normal bones with no significant arthropathy or acute abnormality; (2) negative for soft tissue abnormalities with no visible swelling; (3) no visible effusion; (4) negative for other findings; and (5) concluding remark of "[n]ornal examination."  (AR 594-95.)

On July 13, 2018, Plaintiff presented to Caprioli for a follow-up for Polyarthralgia, Systemic Lupus, Osteoarthritis, and Autoimmune thyroiditis, and to review lab and x-ray results.  (AR 584.)  The report notes "TB quant and Cocci were both negative," hepatitis panel was negative, "Rheumatoid factors was <14," "[i]nflammatory markers were elevated, ESR (22) and CRP (16.34)," Vitamin D levels were within range, "CBC and CMP normal," Uric acid, magnesium, and CPK were normal, urinalysis was negative, x-rays of elbows and left hand were negative, right hand showed minimal osteoarthritic changes, ankle x-rays showed calcaneal spurring; and shoulder x-rays showed mild calcific tendinitis.  (AR 584.)  Caprioli noted Plaintiff was feeling stable; was currently on Plaquenil and Sulfasalazine originally prescribed by her former rheumatologist; noted Plaintiff was flaring more often now and feels like symptoms are

1  worsening; that she does not feel well controlled with her medication regime; and that she feels

2  jittery, anxious, and light headed sometimes, and admits having symptoms of fatigue.  (Id.)  A

3  general examination noted Plaintiff was well developed, well nourished, oriented; normal heart;

4  normal lungs; normal abdomen; and that there were no visible synovitis present in the joints

5  upon the musculoskeletal exam.  (Id.)  For treatment, Caprioli stated: labs and x-rays were

6  reviewed and will order an MRI of left shoulder since x-ray showed mild calcific tendinitis;

7  Plaintiff was to follow-up with her primary care physician for further monitoring of her thyroid;

8  Plaintiff would be referred to Ophthalmology for Plaquenil monitoring; and for pain and fatigue,

9  Plaintiff would be given B12 and depo-medrol injections and was to return in the next week for a

10  Toradol injection.  (AR 585.)

11      On July 25, 2018, Caprioli filled out a form medical questionnaire that contains the

12  opined limitations at issue.  Caprioli first answered that she had been treating Plaintiff for less

13  than six (6) months.  (AR 583.)  In response to the question of whether Plaintiff suffers "from

14  *rheumatological* symptoms, or side effects of medication prescribed for *rheumatological*

15  symptoms, that would affect her ability to focus and to follow instructions," Caprioli checked the

16  space for yes and wrote that Plaintiff was taking Gabapentin three times a day.  (AR 583.)

17  Caprioli checked the box for "No" in response to the question of whether Plaintiff would be able

18  to perform work tasks involving three or more steps for 2 hours at a time given such symptoms

19  and side effects.  (Id.)  In response to the question of which symptoms and side effects support

20  these findings, Caprioli wrote in "fatigue, anxiety, chronic pain/stiff/[and] swollen joints."  (AR

21  583.)

22          2.      The ALJ's Review and Weighing of Caprioli's Opinion

23      Before weighing the opinion, the ALJ summarized the opinion as part of the of his review

24  of all of the opinion evidence, noting Caprioli had treated Plaintiff for less than six months, that

25  Caprioli opined Plaintiff suffered from rheumatological symptoms that would affect her ability to

26  focus, acknowledged the opinion precluded Plaintiff from performing work tasks involving three

27  or more steps for more than two hours, and noted that the symptoms and side effects that were

28  reported on the medical statement were "fatigue, anxiety, chronic pain, as well as stiffness and

14

1    swollen joints." (AR 27, 583.)  The ALJ gave little weight to Caprioli's opinion as follows: "As

2    for Ms. Caprioli's opinion, I note that this was provided after less than six months of treatment

3    and it appears that this is based upon the claimant's subjective allegations as no objective

4    medical testing results were referenced to support the alleged limitations." (AR 27.)

5             3.      The Court Finds the ALJ Properly Weighed Caprioli's Opinion

6             Plaintiff emphasizes that Caprioli opined Plaintiff would be precluded from work that

7    requires three or more steps for two hours at a time, and a limitation to one-to-two step tasks

8    would restrict Plaintiff to Level One reasoning occupations in the Dictionary of Occupational

9    Titles. (Br. 5.)  Thus, because Plaintiff's past position as an insurance clerk is classified as Level

10   Four reasoning, such limitation would preclude Plaintiff from performing her past relevant work,

11   and she would not even be able to perform simple and repetitive tasks or Level Two reasoning

12   occupations, which is a subset of unskilled work. (Br. 6.)  With a limitation to a reduced range

13   of unskilled work, Plaintiff would not have any transferable skills.  (Id.)  Combined with a

14   limitation to sedentary work; an advanced age category; and a high school education; Plaintiff

15   proffers she would meet the disability requirements of Medical Vocational Guideline Rule

16   201.06, 20 C.F.R., Part 404, Subpart P, Appendix 2 § 201.06, if Caprioli's opinion were credited

17   as true. (Br. 6.)

18           Turning to the pointed challenges, Plaintiff first argues the ALJ did not explain

19   specifically what it was about the length of the treatment relationship that called Caprioli's

20   opinion into question, and such rationale is questionable considering the ALJ gave great weight

21   to the opinions of the medical expert who never examined Plaintiff, citing Cleghorn v. Colvin,

22   No. ED CV 15-295 MRW, 2015 WL 8282508, at *3 (C.D. Cal. Dec. 8, 2015); Garcia v. Colvin,

23   No. CV 15-7060 MRW, 2016 WL 3035109, at *5 (C.D. Cal. May 26, 2016);Llewellyn v.

24   Comm'r of Soc. Sec., No. 17-CV-05571-DMR, 2019 WL 1245142, at *10 (N.D. Cal. Mar. 18,

25   2019). (Br. 7.)  Plaintiff argues the second rationale offered by the ALJ, that the opinion

26   appeared to be "based upon the claimant's subjective allegations as no objective medical testing

27   results were referenced to support the alleged limitations," is speculative, as the "ALJ could only

28   surmise, which is insufficient," and "[i]nstead the ALJ must rely on substantial evidence that the

1  medical source based 'to a large extent' on self-reports," citing Ghanim v. Colvin, 763 F.3d
2  1154, 1162 (9th Cir. 2014).  (Br. 7, AR 27.)

3      Defendant appears to concede that if the ALJ *only* offered the length of treatment as the
4  reason for rejecting the opinion, such reason would not stand alone as a sufficient reason to
5  discount the opinion of the physician assistant.  Specifically, Defendant highlights that even
6  when weighing the opinions of acceptable medical source, not just "other sources," the ALJ
7  considers the length of treatment and frequency of examination, 20 C.F.R. § 404.1527(c)(2)(i),
8  and thus it was reasonable for the ALJ to consider the treatment duration of less than six (6)
9  months, and while "not dispositive, this undercut[s] the veracity" of Caprioli's opinion.  (Opp'n
10 6.)  Because of the acknowledgment that such statement would not be dispositive on its own, and
11 because the Court agrees the rationale in the cases cited by Plaintiff is applicable at least in part
12 as discussed below, the Court will accept that the length of treatment would not be a sufficient
13 reason standing alone in this instance.  Accordingly, the Court will consider the ALJ's proffer of
14 the fact that Caprioli treated Plaintiff for less than six months in conjunction with the other
15 reasons given for discounting the opinion, and will refrain from holding as to whether such
16 rationale could independently stand.  For the reasons explained below, taken together, the Court
17 finds the ALJ properly provided germane reasons for discounting the opined limitations provided
18 by Caprioli.

19     As recognized in briefing, the cases cited by Plaintiff did not involve the germane reasons
20 standard, but rather the specific and legitimate standard.  (Br. 7.)  Nonetheless. the Court largely
21 agrees that length of treatment alone is not a dispositive reason standing alone to reject an "other
22 source" given the rationale discussed in these cases.  However, the Court is of the mind that the
23 amount of consideration the particular factor of a one-time visit or short length of treatment an
24 ALJ may properly give, or what deference this Court must show to the ALJ's use of such factor,
25 is likely greater in the case of an "other source" under the germane reasons standard, rather than
26 under the specific and legitimate standard employed when a physician's opinion is weighed.

27     In Cleghorn, the court found it significant that in rejecting the opinion of the examining
28 physician, the ALJ's first and "presumably main" rationale was that the doctor only examined

1   the plaintiff one time, and "[i]n that way, evaluation of this Board-certified orthopedic surgeon

2   was identical to *any* consulting evaluation ordered by the agency in advance of an administrative

3   hearing [and] [t]he ALJ failed to explain why this circumstance was relevant to evaluating

4   Plaintiff's conditions – particularly in light of the ALJ's decision to credit a physician who *never*

5   examined Plaintiff over that of an examining doctor."  Cleghorn, 2015 WL 8282508, at *3

6   (emphasis in original); see also Garcia, 2016 WL 3035109, at *5 (holding the ALJ's rejection of

7   an examining physician's report "in significant part" because she conducted a "one-time

8   examination" of the claimant was a "woefully weak basis" under the specific and legitimate

9   standard, as the court previously found in Cleghorn, as such report is identical to any

10  consultative exam, and thus the "agency faces an obvious goose / gander issue if ALJ's persist in

11  rejecting" medical evidence in such manner); Llewellyn, 2019 WL 1245142, at *10 (holding

12  rejection of examining physician opinion because of one-time exam was error as the hierarchy of

13  examining and treating physicians already accounts for such differences between an ongoing

14  treatment relationship and a non-treating examination, citing Cleghorn and Garcia).

15      In addition to the differing legal standards, there are apparent differences between

16  discounting the opinion of a physician for only conducting a one-time visit, and discounting a

17  physician assistant opinion for a short duration of treatment, such as the similarity of a one-time

18  physician visit to a consultative exam ordered by the agency, and given there is the hierarchy

19  between examining and treating physicians already factored into the regulations.  Further, the

20  manner of reliance here by the ALJ appears distinguishable.  For example, in Cleghorn, the court

21  found the one-time visit was the ALJ's first and "presumably main" rationale and the ALJ failed

22  to explain why it was relevant to evaluating Plaintiff's conditions – particularly given the ALJ

23  credited a physician who did not examine the plaintiff.  See Cleghorn, 2015 WL 8282508, at *3.

24  The duration of treatment was not the main rationale provided by the ALJ here, but more of a

25  factor relevant, or in other words, germane, to the ALJ's conclusion that the opinion appeared to

26  based on subjective complaints rather than objective testing.  (AR 27.)  Further despite

27  Defendant's concession, it appears at least some courts have accepted an ALJ's notation of a

28  one-time visit as a germane reason to discount an "other source," at least when other reasons are

given, or when in relation to another factor.  See Brooke L.T. v. Saul, No. CV 19-111-M-KLD, 2020 WL 1904935, at *9 (D. Mont. Apr. 16, 2020) ("The ALJ reasonably discounted the limitations identified by Lewis for the germane reasons that she had only seen Plaintiff once, imposed extreme limitations inconsistent with the overall medical record, and seemed to rely on Plaintiff's subjective complaints."); Reininger v. Colvin, No. CV 12-01314-PHX-JAT, 2013 WL 3455725, at *7 (D. Ariz. July 9, 2013) (holding ALJ gave germane reasons including that the "nurse practitioner saw the claimant only [once] and there are no additional medical records provided for comparison . . . [and] the ALJ explained that Ms. Moon 'is not an acceptable medical source' under '20 C.F.R. §§ 404.1513, 416.913.' ").

The Court now turns to the ALJ's specific statements and whether they are sufficiently supported by the record.  To be clear, the ALJ did not state the opinion was rendered after a one-time visit, but the opinion "was provided after less than six months of treatment."  (AR 27.)  This rationale was provided in conjunction with the ALJ's statement that the opinion also appeared to be "based upon the claimant's subjective allegations as no objective medical testing results were referenced to support the alleged limitations."  (AR 27.)  Thus taken together, if the ALJ's finding that the report appeared to be based on subjective allegations and no objective medical testing results were referenced to support the limitations is supported by substantial evidence, the ALJ's discounting of the opinion would be bolstered by the consideration of the short length of treatment of this "other source," as the short length of treatment would be relevant to the veracity of the physician assistant's ability to opine such limitations where objective test results are not specifically referenced, and it would be more likely that such opinion was in fact based on subjective reports of symptoms given the limited amount of times that Plaintiff reported to Caprioli for exam.  See Ann U. v. Comm'r of Soc. Sec., No. 3:17-CV-01404-CL, 2019 WL 3495850, at *7 (D. Or. July 9, 2019) ("The ALJ is required to provide germane reasons for rejecting other medical source evidence . . . "[d]uration of treatment relationship and frequency and nature of contact relevant in weighing opinion.").

Again, Plaintiff argues Caprioli did not rely "to a large extent" on Plaintiff's self-reports in rendering her opinion, and an ALJ must rely on substantial evidence that the medical source

was based to a large extent on self-reports, citing <u>Ghanim</u> 763 F.3d at 1162.  (Br. 7.)  In <u>Ghanim</u>, the ALJ discounted the opinions of the treating providers because they were based largely on self-reports, which the ALJ found not credible.  763 F.3d at 1162.  The Ninth Circuit held that where a treating provider's opinions are based "to a large extent" on an applicant's self-reports and not on clinical evidence, and the ALJ finds the claimant not to be credible, the ALJ may then appropriately discount the treating physician's opinion.  <u>Id.</u> (citing <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir.2008)).  "However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion."  <u>Ghanim</u>, 763 F.3d at 1162 (citing <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1199 (9th Cir. 2008)).  The Ninth Circuit found that the ALJ "offered no basis for his conclusion that the[] opinions were based more heavily on Ghanim's self-reports," as the doctors' reports discussed the "providers' observations, diagnoses, and prescriptions, in addition to Ghanim's self-reports."  <u>Ghanim</u>, 763 F.3d at 1162.

Plaintiff emphasizes that Caprioli observed that Plaintiff had elevated inflammatory markers including elevated sedimentation rate ("ESR") and C-reactive protein; noted x-ray findings of some osteoarthritis; noted flaring nature of Plaintiff's condition in spite of medicating with Plaquenil and Sulfasalazine, which have immunosuppressant effects; noted Plaintiff's anxiety, light-headedness and fatigue; and thus the clinical interview cannot be discounted as self-report, <u>Buck v. Berryhill</u>, 869 F.3d 1040, 1049 (9th Cir. 2017).  (Br. 7-8.)  In <u>Buck</u>, the physician's "opinion was based in part on Buck's self-report that he had trouble keeping a job," however the doctor "also conducted a clinical interview and a mental status evaluation," which the Ninth Circuit found to be "objective measures [that] cannot be discounted as a 'self-report.' " 869 F.3d at 1049.  Plaintiff argues that even if Caprioli had relied in part on self-reports, the subjective judgments of a treating source, especially when coupled with objective evidence, are important and play a part in the medical evaluation and Caprioli did not rely to a *large* extent on Plaintiff's self-reports.  (Br. 8.)

The Court has described the relevant records in greater detail above but will highlight significant aspects here.  Plaintiff first presented to Caprioli on June 20, 2018, reporting

1  symptoms such as joint pain and fatigue, and Caprioli recorded a normal physical exam,

2  including a normal musculoskeletal exam with no visible synovitis present in the joints.  (AR

3  587-88.)  Caprioli ordered x-rays and blood work, which were largely normal or showed minimal

4  degenerative changes, with elevated inflammatory markers shown on blood work.  (AR 589-

5  597.)  On July 13, 2018, Plaintiff presented for a follow-up after the testing results, which was

6  the second and only examination of Plaintiff completed by Caprioli.  Caprioli again noted a

7  normal physical examination, signified that an MRI would be completed due to left shoulder x-

8  rays that showed mild calcific tendinitis, and recorded observations about Plaintiff's reported

9  symptoms.  (AR 584.)  Caprioli did not provide opined limitations on this date.  On July 25,

10  2018, Caprioli completed a one-page form medial questionnaire and within which Caprioli only

11  provides "fatigue, anxiety, chronic pain/stiff[and] swollen joints" as the "symptoms and side

12  effects" which support the opined limitations.  (AR 583.)  No testing results were referenced in

13  the July 25, 2018 medical form.  (Id.)

14      Thus, the ALJ's summary of the July 25, 2018 opinion and statement that Caprioli did

15  not cite to any objective medical testing within the opinion is supported by the record.  Taking

16  the actual medical report with the opined limitations standing alone, it was abundantly

17  reasonable for the ALJ to conclude that such opinion was not based on objective testing but

18  rather subjective reports of symptoms by Plaintiff, which the ALJ had properly found not to be

19  credible elsewhere in the decision.  (AR 24-25, 27, 583.)[3]

20      Further, even affording Plaintiff the benefit of incorporating the prior July 13, 2018

21  examination report, and objective testing referenced therein, into Caprioli's July 25, 2018

22  opinion, would not render the ALJ's discounting of the July 25, 2018 opinion error.  As shown in

23  the Court's review of all of the records pertaining to Caprioli above, there is substantial evidence

24  for the ALJ's statement that the report issued less than six months of treatment appeared to be

25  based on Plaintiff's "subjective allegations as no objective medical testing results were

26

27  [3]  The ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms
    were inconsistent with the medical evidence and other evidence, and specifically were inconsistent with
28  improvement demonstrated on treatment and objective medical testing that revealed Plaintiff's condition was
    controlled.  (AR 24-25.)  Plaintiff has not challenged these credibility findings.

referenced to support the alleged limitations." (AR 27.)  This includes consideration of the very minimal degenerative changes shown on objective testing ordered between the two examinations, in conjunction with the normal examination findings before and after the testing, and the large proportion of self-reports of pain and fatigue noted in the reports.  Given Caprioli's ordering of the x-rays and blood work following the first visit and the mild findings obtained, the fact that Caprioli did not specifically reference any of these then obtained test results when proffering the opined limitations supports the ALJ's finding that the opinion was based on Plaintiff's subjective complaints.  Further, the fact that Caprioli ordered an MRI to follow-up on one mild finding regarding the left shoulder x-ray is significant because Plaintiff does not indicate the MRI was completed, or considered by Caprioli, or another physician at a later date, and it does not appear such MRI is in the record.

To summarize and restate, the ALJ noted in his summary of the medical statement, that the symptoms and side effects that were reported on the medical statement as a basis for the opined limitations were "fatigue, anxiety, chronic pain, as well as stiffness and swollen joints." (AR 27, 583.)  The ALJ rejected the medical statement noting it was provided after less than six months of treatment, and "it appears that this is based upon the claimant's subjective allegations as no objective medical testing results were referenced to support the alleged limitations."  (AR 27.)  The ALJ's statement is correct: the July 13, 2018 medical statement did not reference any objective medical testing results to support the alleged limitations.  The medical statement form asked both whether any rheumatological symptoms *or* side effects from medication prescribed for such symptoms would affect the ability to focus or follow instructions, and Caprioli only wrote yes, Gabapentin, only appearing to reference medication that may be affecting the ability to focus.  (AR 583.)  Caprioli then answered given such symptoms or side effects of the medication referenced in the previous question, whether Plaintiff would be unable to perform tasks with three or more steps, and Caprioli answered no given such symptoms or side effects.  Then, in response to the question of which symptoms and side effects support these limitations, Caprioli wrote in "fatigue, anxiety, chronic pain/stiff/[and] swollen joints."  (AR 583.)  While Caprioli may have made some clinical observations and reviewed certain x-ray results in the

1   month prior to issuing the medical statement with the opined limitations (AR 585, 587), Caprioli

2   only expressly based the opined limitations on the fact that Plaintiff was taking Gabapentin,

3   apparently in reference to self-reported symptoms or side effects as shown in the previous visit

4   reports, and on Plaintiff's fatigue, anxiety, chronic pain, stiffness, and swollen joints, which

5   aside from perhaps some observation of stiffness and swollen joints, and the mild findings of the

6   x-rays, the Court cannot say translates to a necessary finding that the medical statement was not

7   largely based on self-reported symptoms or side effects of fatigue, anxiety, chronic pain and

8   stiffness.

9          Accordingly, the Court finds the ALJ provided germane reasons supported by substantial

10  evidence in the record to accord reduced weight to Caprioli's opinion and the ALJ did not

11  commit legal error.  See Frost v. Berryhill, 727 F. App'x 291, 294 (9th Cir. 2018) ("The ALJ

12  gave germane reasons for discounting Ms. Crisp's opinion because her opinion was inconsistent

13  with the notes that she cites in support of her opinion, she did not include objective notes to

14  support the indicated limitations, and she appeared to rely heavily on Frost's subjective

15  reports."); Young v. Comm'r of Soc. Sec., 594 F. App'x 914, 917 (9th Cir. 2014) ("The ALJ

16  gave several germane reasons [including] . . . assessment did not cite any objective clinical

17  findings that would corroborate her determinations of a permanent disability [and the] disability

18  determination was contradicted by her own treatment notes and was not consistent with the

19  findings of the clinical neuropsychologist and the state agency's psychiatric consultant.");

20  Reichley v. Berryhill, 723 F. App'x 540, 541 (9th Cir. 2018) ("ALJ provided the requisite

21  germane reasons in affording little weight to the assessments of a physician assistant . . .

22  [including] correctly [finding] that the assessments relied heavily on Reichley's subjective

23  complaints and conflicted with Reichley's conservative medical treatment, treatment notes,

24  objective medical findings, and normal physical examinations."); Brooke L.T., 2020 WL

25  1904935, at *9 ("The ALJ reasonably discounted the limitations identified by Lewis for the

26  germane reasons that she had only seen Plaintiff once, imposed extreme limitations inconsistent

27  with the overall medical record, and seemed to rely on Plaintiff's subjective complaints.");

28  Murray v. Colvin, No. 2:12-CV-3122-FVS, 2014 WL 1233141, at *8 (E.D. Wash. Mar. 25,

2014) ("ALJ's determination that the therapist opinions are based primarily on unreliable self-report with no supporting clinical testing is germane to each opinion."); Ellingson v. Berryhill, No. 6:16-CV-01358-JR, 2017 WL 3718381, at *6 (D. Or. Aug. 29, 2017) (ALJ properly gave no weight to opinion where "opinion relied almost exclusively on plaintiff's subjective complaints, [was] devoid of objective testing, and contain[ed] few independent observations," and ALJ thus found "was overly reliant on plaintiff's non-credible subjective complaints."); Reininger, 2013 WL 3455725, at *7 (ALJ gave germane reasons including fact of one-time visit and absence of other medical records for comparison).

**B.     Whether the ALJ Erred in Considering the Medical Expert's Testimony Regarding Plaintiff's Equaling Listing 14.09D**

Plaintiff argues the ALJ improperly disregarded Dr. Alpern's testimony without properly considering testimony regarding Plaintiff's equivalence to the severity identified in listing 14.09D.  (Br. 9.)

1.     Step Three Legal Standard

At step three the ALJ considers if the claimant has an impairment, or combination of impairments, that meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, App. 1. Burch, 400 F.3d at 679.  "If the claimant meets or equals one of the listed impairments, a conclusive presumption of disability applies." Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990).  "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.  A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).  However, the ALJ need not discuss the findings in any specific section of his opinion. Lewis, 236 F.3d at 513.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990); see also Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999) ("To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her

1   claim.").

2       Equivalence may be determined if the claimant has multiple impairments none of which

3   meets the listing requirement, but which when viewed in the aggregate are equivalent to a listed

4   impairment.  Burch, 400 F.3d at 682.  "To *equal* a listed impairment, a claimant must establish

5   symptoms, signs and laboratory findings 'at least equal in severity and duration' to the

6   characteristics of a relevant listed impairment, or, if a claimant's impairment is *not* listed, then to

7   the listed impairment 'most like' the claimant's impairment."  Tackett, 180 F.3d at 1099 (quoting

8   20 C.F.R. § 404.1526) (emphasis in original); Sullivan v. Zebley, 493 U.S. 521, 531 (1990) ("For

9   a claimant to qualify for benefits by showing that his unlisted impairment, or combination of

10  impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in

11  severity to '*all*' the criteria for the one most similar listed impairment.").

12      In determining if a claimant's combination of impairment equals a listing the ALJ must

13  consider the symptoms in combination and cannot fragment them in evaluating their effects.

14  Lewis, 236 F.3d at 514.  "Medical equivalence must be based on medical findings."  Tackett,

15  180 F.3d at 1100 (quoting 20 C.F.R. § 404.1526); see also Lewis, 236 F.3d at 514 ("A finding of

16  equivalence must be based on medical evidence only.") (quoting 20 C.F.R. § 404.1529(d)(3)).

17  "A generalized assertion of functional problems is not enough to establish disability at step

18  three."   Tackett, 180 F.3d at 1100.   "A claimant cannot qualify for benefits under the

19  'equivalence' step by showing that the overall functional impact of his unlisted impairment or

20  combination of impairments is as severe as that of a listed impairment."  Kennedy v. Colvin, 738

21  F.3d 1172, 1176 (9th Cir. 2013) (quoting Sullivan, 493 U.S. at 531).  "The reason for this is

22  clear[:] Listed impairments are purposefully set at a high level of severity because the listings

23  were designed to operate as a presumption of disability that makes further inquiry unnecessary,"

24  and results in an award of "benefits without a determination whether he actually can perform his

25  own prior work or other work."  Kennedy, 738 F.3d at 1176 ("Listed impairments set such strict

26  standards because they automatically end the five-step inquiry, before residual functional

27  capacity is even considered.").

28  / / /

### a.      Listing 14.09(D)

The regulations provide the following requirements for listing 14.09(D):

D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09(D).  The regulations provide definitions of two of the constitutional symptoms or signs.  "Severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(C)(2).  "Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function."  Id.  The regulations provide the following guidance for considering such symptoms:

> H. How do we consider your symptoms, including your pain, severe fatigue, and malaise?
> Your symptoms, including pain, severe fatigue, and malaise, may be important factors in our determination whether your immune system disorder(s) meets or medically equals a listing or in our determination whether you are otherwise able to work. In order for us to consider your symptoms, you must have medical signs or laboratory findings showing the existence of a medically determinable impairment(s) that could reasonably be expected to produce the symptoms. If you have such an impairment(s), we will evaluate the intensity, persistence, and functional effects of your symptoms using the rules throughout 14.00 and in our other regulations. See §§ 404.1521, 404.1529, 416.921, and 416.929. Additionally, when we assess the credibility of your complaints about your symptoms and their functional effects, we will not draw any inferences from the fact that you do not receive treatment or that you are not following treatment without considering all of the relevant evidence in your case record, including any explanations you provide that may explain why you are not receiving or following treatment.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(H).

Under the regulations, the term "repeated" means "the manifestations occur on an average of three times a year, or once every 4 months, each lasting 2 weeks or more; or the manifestations do not last for 2 weeks but occur substantially more frequently than three times in a year or once every 4 months; or they occur less frequently than an average of three times a year

or once every 4 months but last substantially longer than 2 weeks." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(I)(3). A claimant's impairment will meet the "repeated" "criterion regardless of whether [they] have the same kind of manifestation repeatedly, all different manifestations, or any other combination of manifestations; for example, two of the same kind of manifestation and a different one." Id. Further, the claimant "must have the required number of manifestations with the frequency and duration required [and] the manifestations must occur within the period covered." Id.

The term "[m]arked limitation means that the signs and symptoms of your immune system disorder interfere seriously with your ability to function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(I)(5). "Although we do not require the use of such a scale, 'marked' would be the fourth point on a five-point scale consisting of no limitation, mild limitation, moderate limitation, marked limitation, and extreme limitation." Id.

"Activities of daily living include, but are not limited to, such activities as doing household chores, grooming and hygiene, using a post office, taking public transportation, or paying bills." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § I(6). The regulations provide that the Agency is to find a "marked" limitation in activities of dialing where a claimant has "a serious limitation in [the] ability to maintain a household or take public transportation because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, caused by [the] immune system disorder (including manifestations of the disorder) or its treatment, even if [claimant is] able to perform some self-care activities. Id.

"Social functioning includes the capacity to interact independently, appropriately, effectively, and on a sustained basis with others [and] includes the ability to communicate effectively with others." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § I(7). The Agency is to find a "marked" limitation in maintaining social functioning if a claimant has "a serious limitation in social interaction on a sustained basis because of symptoms, such as pain, severe fatigue, anxiety, or difficulty concentrating, or a pattern of exacerbation and remission, caused by your immune system disorder (including manifestations of the disorder) or its treatment, even if you are able to communicate with close friends or relatives." Id.

1    "Completing tasks in a timely manner involves the ability to sustain concentration,
2    persistence, or pace to permit timely completion of tasks commonly found in work settings."  20
3    C.F.R. Pt. 404, Subpt. P, App. 1, § I(8).   The Agency is to find a "marked" limitation in
4    completing tasks if a claimant has a "serious limitation in [the] ability to sustain concentration or
5    pace adequate to complete work-related tasks because of symptoms, such as pain, severe fatigue,
6    anxiety, or difficulty concentrating, caused by [the] immune system disorder (including
7    manifestations of the disorder) or its treatment, even if [claimant is] able to do some routine
8    activities of daily living."  Id.

9           2.    The Relevant Hearing Testimony and the ALJ's Findings

10          At the administrative hearing, the ALJ asked the medical expert Dr. Alpern ("ME" or
11   "Dr. Alpern"), if based on review of exhibits 1 through 16F, with reasonable medical probability
12   at any point from October 1, 2014 to the present, whether Plaintiff met the criteria of any listing.
13   (AR 55.)   The ME answered that he considered listing 14.09D, pertaining to rheumatoid
14   inflammatory diseases, "but it's very hard to get to equal that because of the lack of precise
15   dates."  (AR 56.)  The ALJ then asked about 1.02 or 1.04 for the degenerative disc disease or
16   degenerative joint disease of the knees, and the ME testified that they could not find enough for
17   either listing, but then returned to the previous question and stated "I'll go back and say that she
18   could probably equal [listing] 14.09D because of the combination of problems if you take them
19   altogether."  (AR 56.)  The ALJ then asked the ME how he came to such opinion, and the ME
20   stated this was considering the rheumatoid factor is elevated when combined, and Plaintiff has
21   problems with multiple joints.  (Id.)  The ALJ proceeded to inquire as what the ME ultimately
22   concluded as to functional limitations and ability to perform work, and asked "[b]ut in light of
23   Exhibits 1 through 16F with reasonable medical probability" whether Plaintiff could perform a
24   light exertional demand job at any time during the relevant period, with lifting occasionally
25   twenty (20) pounds, frequently ten (10) pounds, and standing six hours out of an eight hour
26   workday, and Dr. Alpern responded that he indicated in his notes that Plaintiff could perform a
27   job with the same weight exertional limits, but limited to two hours of standing or walking,
28   which translates to a sedentary level of work.  (AR 56-57.)

1    Therefore, the ME concluded that Plaintiff could not meet listing 1.02 or 1.04, "could

2    probably equal" listing 14.09(D), and that Plaintiff could perform a range of sedentary work.

3    (AR 56-57.)

4    At step three, in making the determination that Plaintiff did not meet or equal the criteria

5    for listing 14.09 generally, the ALJ found:

6    > The inflammatory arthritis does not meet or medically equal the criteria of listing
     > 14.09 (entitled *Inflammatory arthritis*) as she is able to ambulate effectively
7    > without the use of an assistive walking device and able to perform fine and gross
     > manipulations effectively.  Furthermore, the record lacks significant evidence of
8    > inflammation or deformity, as defined in 14.09B, in one more peripheral joints,
     > ankylosing spondylitis or other spondyloarthropathies, and lack of repeated
9    > manifestations of inflammatory arthritis.

10   (AR 22.)  Dr. Alpern's testimony was not referenced in this section of the opinion as a basis for

11   the step three determination.  As applicable to the requirements of 14.09(D) specifically, the ALJ

12   found the record did not demonstrate repeated manifestations of inflammatory arthritis.

13   In summarizing the opinion of Dr. Alpern in the section of the opinion determining the

14   RFC, the ALJ stated that Dr. Alpern had opined that Plaintiff did not meet any listing, however,

15   the ALJ did not specifically clarify that Dr. Alpern had returned to the question and testified that

16   Plaintiff *could probably* equal the listing classification for 14.09(D):

17   > Harvey L. Alpern, M.D. an impartial medical expert, testified at the hearing that
     > the record revealed diagnoses of diabetes, degenerative disc disease of the neck
18   > and back, degenerative disease of the knees.  As for the hypothyroidism and
     > lupus, Dr. Alpern testified that the record lacked evidence substantiating either
19   > condition.   Dr. Alpern opined that, since October 1, 2014, the claimant's
     > condition did not meet or medically equal listing severity.  Dr. Alpern further
20   > opined that the claimant was capable of performing sedentary exertional work.
     > She could stand and walk two hours of an eight-hour workday, sit for six hours
21   > occasionally perform postural activities, but never climb ropes or ladders.  She
     > should avoid concentrated exposure to fumes and gases.
22

23   (AR 26.)  The ALJ gave great weight to the opinion because it was "based upon a review of the

24   record available at the hearing level, as a whole, is consistent with the objective medical

25   evidence and the claimant's treatment history, and is supported by the generally mild clinical

26   findings noted during physical examinations."  (AR 26.)

27   The ALJ also made findings regarding limitations of activities of daily living, in

28   maintaining social functioning, and in completing tasks in a timely manner due to deficiencies in

28

concentration, persistence, or pace.

The ALJ generally found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms, to be inconsistent because the record reveals that with treatment, Plaintiff's condition was generally controlled and improved, and the ALJ cited numerous records indicating Plaintiff had reported improvement with pain management treatment, that medical testing results revealed Plaintiff's condition was generally controlled, and records wherein Plaintiff had reported no side effects from medication.   (AR 24-25.) Specifically, the ALJ noted records that demonstrated Plaintiff "was able to carry out activities of daily living and ambulate with ease (Ex. 1F/2; 12F/4, 10, 12, 14, 16, 19)."[4] (AR 24.)  The ALJ found "[r]eviews of systems revealed that the claimant denied fatigue, diabetes, obesity, high blood pressure, weight gain, weight loss, double vision, excessive hunger, urinary frequency, back problems, joint pain, or cold intolerance (Ex. 1F; 11F; 12F) [and that Plaintiff] reported that her physical strength and appetite were normal (Ex. 1F/1, 5, 12; 12F/2, 6, 10, 14, 19, 23, 27, 31)."  (AR 25.)  The ALJ stated "[o]n multiple occasions . . . claimant had shown functional improvement and was able to do socializing without any support or dependencies."  (AR 25.)

The ALJ made the following findings regarding Plaintiff's reported ability to complete daily activities, maintain social functioning, and ability to complete tasks in a timely manner:

> Despite the allegations, the record reveals that the claimant reported functioning beyond what was alleged.  In the Adult Function Report, she stated that she does light house cleaning, cooking, laundry twice a week, and she feeds the pets.  The claimant reported that she prepares her own easy meals most of the time.  She

---

[4]  On March 23, 2016, Plaintiff presented to Central California Pain Management for a knee injection.  (AR 309.) The patient history states: "Activity of daily living: Able," and treatment records noted: "Patient [r]eports adequate pain relief with present medication regimen and pain control levels are better.  Patient is able to carry out daily routine physical activities and shown functional improvement and is able to do socializing without any support or dependencies.  Hence my plan is to continue with current medications and dosage."  (AR 309-10.)  On February 9, 2017, Plaintiff again presented for pain management and the record reflects the same notations as the March 23, 2016 record.  (AR 444, 446.)  On April 10, 2017, Plaintiff again presented for pain management and the patient history states "Activity of daily living: Able," and treatment records noted: "In today['s] visit patient reports moderate relief from current medications and is able to carry out activity of daily living [] able to ambulate with ease and complete ADLS, pain does not go away completely but it eases up to the point it['s] not debilitating.  Denies any other concerns at this time."  (AR 439, 441.)  On July 24, 2017, Plaintiff again presented for pain management follow-up, and the patient history states "Activity of daily living: Able," and treatment records noted: "In today['s] visit patient reports moderate relief from current medications and is moderately able to carry out activity of daily living.  Pain does not go away completely but it eases up to the point it['s] not debilitating.  Denies any other concerns at this time."  (AR 435, 437.)  On November 6, 2017, records reflect the same notation as the July 24, 2017 record.  (AR 427, 429.)

goes outside twice a day, is able to drive a car, and can go out alone.  The claimant stated that she goes shopping in stores and by computer and is able to handle her finances.  She has no social limitations, spends time with others regularly, and gets along with authority figures.  The claimant reported that she does not require reminders.  As for following written and spoken instructions, the claimant reported that she could do these things "well enough."  She can hand changes in routine "very well" (Ex. 3E).

At the hearing, the claimant testified that she feeds her two dogs, does a small exercise routine at home, and is able to walk about 30 minutes at Walmart.  She testified that she uses her cell phone for social media and to make phone calls.  Moreover, the claimant reported that while she was a caretaker for her mother from July 2015 to February 2016, her duties included protective care and light cooking.  She stated that she stood for one hour and sat for three hours (Ex. 4E).  Records from October 2016 reveal that the claimant stated that she had gone to the fair and had stood for a long period of time (Ex. 15F/55).

(AR 26.)  The ALJ also made relevant findings when determining Plaintiff's reported depression is a non-medically determinable impairment:

As for the reported depression, I find that it is a non-medically determinable impairment. Although the claimant alleged difficulty with concentration and focus and was occasionally noted as being anxious and depressed, the record reveals a lack of mental health treatment. Furthermore, at other visits with her treaters the claimant denied depression, anxiety, behavioral or mood changes, sleeping difficulty, or suicidal ideation (Ex. 1F; 3F; 7F; l 1F; 12F). In addition, the claimant reported that she is able to perform variety daily chores adequately and independently and handle her own finances (Ex. 3E; IF). Also, records reveal no reported psychotic disturbance or suicidal actions and her mental status examinations revealed that the claimant was alert, oriented times three, in no acute distress, memory was intact, and mood and affect were normal.  She denied visual/auditory hallucinations and no suicidal or homicidal ideation was reported (Ex. 1F; 5F-7F; 13F; 15F).  Moreover, the claimant has not required impatient hospitalizations or residential treatment.

(AR 20-21.)  The ALJ also made the following relevant findings regarding functional limitations, finding only mild limitations:

In making this finding, I have considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.

Based on a review of the overall record, I find that the claimant has the following limitations in regards to the "paragraph B" criteria.  The first functional area is understanding, remembering, or applying information.  In this area, the claimant has a mild limitation.  The next functional area is interacting with others.  In this area, the claimant has a mild limitation.  The third functional area is concentrating, persisting, or maintaining pace.  In this area, the claimant has a mild limitation. The fourth functional area is adapting or managing oneself.  In this area, the claimant has a mild limitation.

1
2    Because the claimants medically determinable mental impairment causes no more
     than mild limitation in any of the functional areas, it is nonsevere (20 CFR
3    404.1520a(d)(1)).

4    (AR 21.)

5        3.    The ALJ did not Commit Remandable Error in Determining Plaintiff did not Meet
6              or Equal Listing 14.09(D)

7        Based on the ALJ's findings summarized in the previous section, the Court's review of

8    the records cited in support of such findings as well as other evidence in the record, and for the

9    reasons explained below, the Court holds that the ALJ's determination that Plaintiff did not meet

10   or equal any component of listing 14.09, including 14.09(D), is reasonable and amply supported

11   by substantial evidence in the record.  Plaintiff has failed to meet the burden of demonstrating

12   there is medical evidence in the record to affirmatively satisfy the requirement of repeated

13   manifestations of inflammatory arthritis.  Aside from Dr. Alpern's testimony, Plaintiff has not

14   specifically challenged the finding that there was a lack of evidence of repeated manifestations of

15   inflammatory arthritis, nor the ALJ's findings of mild limitations in activities of daily living,

16   social functioning, and concentration, persistence or pace.  Further, any error the ALJ may have

17   committed in summarizing or utilizing Dr. Alpern's testimony was harmless to the ALJ's

18   ultimate determination that Plaintiff did not meet or equal any listing, including listing 14.09(D).

19   The Court now turns to the parties' specific arguments.

20       Plaintiff argues the ALJ improperly disregarded Dr. Alpern's opinion by failing to

21   mention Dr. Alpern's testimony regarding equivalence to the severity identified in listing

22   14.09D, and in light of Dr. Alpern's testimony, the ALJ's failure to consider the issue of

23   equivalence under Listing 14.09D was error, Lewis, 236 F.3d at 512 (citing Marcia, 900 F.2d

24   176.  (Br. 9.)[5]  Defendant argues that while the ALJ gave great weight to Dr. Alpern's testimony,

25   _____
     [5]  In Marcia, the Ninth Circuit held the ALJ's equivalence finding was "insufficient to show that the ALJ actually
26   considered equivalence."  Marcia, 900 F.2d 176.  Therein, the ALJ's finding as to equivalence only read: "The
     claimant has failed to provide evidence of medically determinable impairments that meet *or equal the Listings* to
27   Subpart P of Regulation 4 or the duration requirements of the Act."  Marcia, 900 F.2d 176 (emphasis added by Ninth
     Circuit).  The Ninth Circuit held that in making an equaling determination at step three, "the ALJ must explain
28   adequately his evaluation of alternative tests and the combined effects of the impairments . . . [and] the statement
     that Marcia did not equal the listing was insufficient."  Id.

1    any error would be harmless because the ALJ properly found that Plaintiff did not meet the

2    requirements of listing 14.09(D) and Dr. Alpern's testimony was equivocal on the matter,

3    Hootman v. Comm'r of Soc. Sec., 499 Fed.App'x 673, 675 (9th Cir. 2012) (citing Lewis v.

4    Apfel, 236 F.3d 503, 514 (9th Cir. 2001)[6]; Molina, 674 F.3d at 1111 (may not reverse for

5    harmless error and burden generally on claimant to demonstrate harm).  (Opp'n 8.)

6         Plaintiff did not file a reply brief, but anticipating Defendant's argument regarding

7    equivocation, Plaintiff contends that even if Dr. Alpern's testimony regarding equivalence could

8    be construed as ambiguous, which Plaintiff states it is not, the ALJ failed to explain how he

9    resolved that ambiguity in the decision.  (Br. 10.)  Plaintiff emphasizes that courts and the

10   Defendant Agency have been known to consider opinions predicated upon probability.[7]  Plaintiff

11   cites Bruton v. Massanari, 268 F.3d 824, 827 (9th Cir. 2001), wherein the case was remanded on

12   _____

13   [6]  Defendant cites Lewis for the holding that "[a] finding of equivalence must be based on medical evidence only."
     Lewis, 236 F.3d at 514 (citing 20 C.F.R. § 404.1529(d)(3)).  The Ninth Circuit upheld the ALJ's decision even

14   though the "ALJ did not discuss the combined effects of Lewis's impairments, or compare them to any listing."
     Lewis, 236 F.3d at 514.  The Ninth Circuit found that "[u]nlike the claimants in *Lester* and *Marcia*, however, Lewis

15   has offered no theory, plausible or otherwise, as to how his seizure disorder and mental retardation combined to
     equal a listed impairment.  Nor has he pointed to evidence that shows that his combined impairments equal a listed

16   impairment.  He has shown no evidence that his seizures had even a temporary effect of lowering his IQ.  He might
     have argued that grogginess from his medications and seizures exacerbated the effect of his mental retardation, but

17   the ALJ explicitly rejected Lewis's claim of grogginess.  Likewise, Lewis has pointed to no evidence that his mental
     retardation exacerbated his seizure disorder.  Nothing in the regulations, moreover, says a claimant may circumvent

18   the compliance requirement of the epilepsy listings by "equaling" rather than "meeting" the listing.  The ALJ did not
     err in concluding that Lewis's conditions did not equal a listed impairment."  Id.

19   In Hootman, the Ninth Circuit upheld the ALJ's equaling determination as "there was no objective evidence to show
     that Hootman's condition equaled the relevant listed impairments . . . [and] [h]ere, the ALJ considered all the

20   relevant evidence in determining whether Hootman met the listed criteria and there were no additional compounding
     impairments, nor additional objective or medical evidence, that could have enabled Hootman to equal the listings."

21   Hootman v. Comm'r of Soc. Sec., 499 F. App'x 673, 675–76 (9th Cir. 2012).

22   [7]  Plaintiff cites Bergfeld v. Barnhart, 361 F. Supp. 2d 1102, 1112–13 (D. Ariz. 2005) (holding ALJ failed to provide
     specific and legitimate reasons for rejecting treating medical source even though it was at odds with another medical

23   opinion that found claimant is probably capable of coping with a low to moderate stress environment); Anderson v.
     Comm'r of Soc. Sec., No. CIV 08-119-JE, 2009 WL 1035093, at *10 (D. Or. Apr. 17, 2009) (noting a medical

24   opinion that impairments "could be debilitating, and that the symptoms she experienced from her impairments
     would probably distract her to the point that she could not work, were well supported"); Butler v. Colvin, No. 3:13-

25   CV-01361-KI, 2014 WL 5488811, at *6 (D. Or. Oct. 29, 2014) (ALJ's RFC addressed certain concerns in opinion
     that used equivocal language "probably" and "should," and ALJ also provided specific and legitimate reasons for

26   discounting the same opinion); Stephens v. Chater, 77 F.3d 490 (9th Cir. 1996) (rejecting defendant's pos-hoc
     attempt to support ALJ rejection of opinion because doctor also opined claimant could probably start looking for

27   work, and also stating in dictum that "[v]ague assertions by the treating physician that appellant could probably start
     looking for work carry little, if any, weight in determining whether a claimant is disabled for purposes of the

28   disability regulations").

the basis that Bruton may have a significant non-exertional limitation.  (Br. 10.)[8]  Thus, Plaintiff

argues that even if Dr. Alpern's opinion regarding equivalence was ambiguous or equivocal, the

ALJ had the duty to consider the opinion and provide an explanation if the ALJ found the

opinion lacking in merit, which the ALJ did not do.  (Br. 10.)

The Court does not disagree that an ALJ, or the Agency, or a court, may properly find

support or utilize a medical opinion that utilizes the words "probably" or "could" in opining on

limitations.  The Court is also of the mind that where an opinion is equivocal, the ALJ may

properly consider the fact that the opinion is equivocal in utilizing the opinion or comparing to

other medical evidence in the record.  Here, the Court does not dispute that the ALJ failed to

explicitly clarify that the medical expert's testimony included a statement that Plaintiff could

probably equal listing 14.09(D), after first testifying that Plaintiff would not meet or equal such

listing.

Anticipating Defendant's argument that Dr. Alpern testified Plaintiff could perform

sedentary work in conflict with testimony of equivalence to a listing, Plaintiff addressed this

issue in the opening brief, but did not file a reply brief addressing Defendant's specific

arguments.  Plaintiff emphasizes the issue of the listings is a step-three consideration, and if an

individual meets or equals a listing, the individual is conclusively presumed disabled, the

analysis ends right then and there, and while disabled individuals may retain some ability to

work, their capacity for work is removed from the analysis once the medical severity identified

in a listing has been met or equaled.  (Mot. 10.)[9]  In response to Plaintiff's argument that the

---

[8]  In Bruton, the Court noted significant non-exertional impairments, which are impairments that limit the ability to work "without directly affecting . . . strength" "may make reliance on the grids inappropriate."  268 F.3d at 827 (citations omitted).  Noting an inability to lift the arms above ninety degrees may be a non-exertional limitation, the Ninth Circuit found a doctor's report that Bruton was precluded from "prolonged carrying, forceful pushing and pulling, and work *at or above the shoulder* level . . . therefore suggest[ed] that Bruton's shoulder impairments may amount to a non-exertional physical limitation," and because Bruton may have that impairment, the Commissioner could not rely on the grids and instead must rely on the testimony of a vocational expert to determine under Step Five whether Bruton remained capable of performing other jobs.  Id. at 828.

[9]  Plaintiff also highlights that at the hearing, the ALJ asked the VE whether an individual who needs to use a walker could perform Plaintiff's past relevant work (AR 67).  Plaintiff notes that an individual who relies on a walker is unable to ambulate effectively, and argues that would meet the severity requirements of listings such as 1.02A, 1.04D, and 14.09A1.  (Br. 10-11.)  However, the VE testified that the use of a walker would not prevent Plaintiff from performing her past relevant work (AR 67), and Plaintiff proffers this exchange further bolsters the fact that, once a claimant has met or equaled a listing, any subsequent finding is no longer relevant because the claimant is

1   Agency cannot rely on Dr. Alpern's opinion that Plaintiff could perform sedentary work because

2   the listing is a step three consideration (Br. 10), Defendant argues this "only shows that Dr.

3   Alpern's opinion was unclear – she could equal the Listing but was also capable of sedentary

4   work – and the ALJ resolved the conflicts and ambiguities, which is his role."  (Opp'n 10.)

5       While the Court agrees the testimony was equivocal and such fact was ripe for

6   consideration by the ALJ, if the ALJ was attempting to discount such aspect of the testimony, the

7   Court cannot say it agrees with Defendant's proffer that the ALJ in fact properly resolved any

8   ambiguities.[10]  It is not absolutely clear from the opinion that the ALJ considered the fact that the

9   expert returned to and modified the testimony during the hearing and stated Plaintiff probably

10  could equal listing 14.09(D).  (AR 55-56.)  On the other hand, given the equivocal nature of the

11  testimony and the apparent resultant interaction between the ALJ and the ME whereby the ALJ

12  then directed questioning for a more definitive overall opinion based on all of the evidence

13  regarding functional limitations, and the ME's conclusion from that that line of questioning that

14  Plaintiff could perform sedentary work (AR 55-57), a rational interpretation of the ALJ's

15  summarization is an that it is an accurate statement: "Dr. Alpern opined that, since October 1,

16

17  conclusively presumed to be disabled.  (Br. 11.)  While not wanting to astray too far from the issues that are
    determinative of this action, the Court will make a few observations.  The Court takes Plaintiff's argument to be that
18  the VE's testimony here is similar to the ME's testimony of an ability to perform sedentary work, and thus
    demonstrative of both being irrelevant, because a determination at step three of equaling one of these listings with an
19  inability to ambulate would make the VE's testimony incorrect.  However, it does not appear that simply reliance on
    a walker and related inability to ambulate means a claimant would necessarily meet a listing.  For example, listing
20  1.02A for major dysfunction of a joint requires a showing of "gross anatomical deformity (e.g., subluxation,
    contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of
21  motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging
    of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) [w]ith: . . . [i]nvolvement of one
22  major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as
    defined in 101.00B2b."  20 C.F.R. § 404, Subpt. P, app'x 1, 1.02; see also Sanders v. Astrue, No. EDCV 10-787-
23  MAN, 2011 WL 2669230, at *4 (C.D. Cal. July 6, 2011).  An inability to ambulate effectively taken alone would
    not equal such listing.  While ambulation is not at issue for listing 14.09(D), and Plaintiff has not challenged any
24  findings regarding ambulation, the Court notes the ALJ considered the fact that while Plaintiff requested a referral
    for a walker with a seat, and was prescribed one, Plaintiff did not get the walker because she could not afford it.
25  (AR 23-24.)  Plaintiff's testimony regarding this issue appeared inconsistent or deceptive.  (AR 65-67.)

26  [10]   The Court generally agrees with Defendant that given the equivocal nature of the testimony and opinion that
    Plaintiff could perform sedentary work, Dr. Alpern's opinion is of less probative value.  See Khal v. Berryhill, 690
27  F. App'x 499, 501 (9th Cir. 2017) ("Dr. Puzziss's opinion that Khal was 'probably incapable of any kind of work'
    was equivocal, rendering Dr. Puzziss's opinion less compelling.").  However, the ALJ did not clearly stated the
28  opinion was equivocal.

34

2014, the claimant's condition did not meet or medically equal listing severity. Dr. Alpern further opined that the claimant was capable of performing sedentary exertional work." (AR 26.) Nonetheless, even if that is not a rational interpretation of the ALJ's interaction and use of the ME's testimony, for the reasons explained below, the ALJ's determination that Plaintiff did not meet any listing is supported by substantial evidence; Plaintiff has not sufficiently made an affirmative case that there is medical evidence in the record to demonstrate that Plaintiff could equal the requirements of listing 14.09(D); and Plaintiff has not specifically challenged nor shown harmful error in the ALJ's independent determinations of mild limitations.

At step three, the ALJ found that the record lacked repeated manifestations of inflammatory arthritis. (AR 22.)[11] As detailed above, listing 14.09(D) requires repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: (1) limitation of activities of daily living; (2) limitation in maintaining social functioning; and (3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09(D).

Defendant argues the ALJ's determination is supported by the record, proffering that while Plaintiff complained of fatigue (citing, AR 313,[12] 334, 320), the record generally showed no complaints of fever (AR 334, 385-86, 388-90, 425, 469, 539, 576-77, 579-80) with a few exceptions (AR 463, 466, 472, 476, 587), and the record did not show malaise (AR 385-86, 388-90, 576-77, 579-80), or involuntary weight loss (AR 309, 313, 320, 427, 431, 435, 439, 444, 448, 452, 456). (Opp'n 9.) Plaintiff did not file a reply brief that disputes the Defendant's proffer of this review of the records, and in the opening brief, Plaintiff did not affirmatively point to

---

[11] As noted above, in a different portion of the opinion the ALJ noted In another portion of the opinion, the ALJ found "claimant reported no side effects from medication . . . [o]n numerous occasions, the claimant denied any other issues and stated that she had no other complaints [and]. . . [r]eviews of systems revealed that the claimant denied fatigue, diabetes, obesity, high blood pressure, weight gain, weight loss, double vision, excessive hunger, urinary frequency, back problems, joint pain, or cold intolerance . . . [and Plaintiff] reported that her physical strength and appetite were normal." (AR 25.)

[12] While Defendant appears to cite these record as demonstrating Plaintiff reported fatigue, two of these records show that Plaintiff denied fatigue. On December 4, 2015, and June 23, 2015, Plaintiff in fact denied weight loss or fatigue, and reported normal appetite and strength. (AR 313, 320.)

1    evidence in the record that demonstrates Plaintiff can meet or equal the listing.  Nonetheless, the

2    Court took the liberty of reviewing these records cited by Defendant as well as searching the

3    entire record for other records relevant to this first prong of the listing 14.09(D) criteria.

4         The Court has found the following instances of reporting of fatigue in the record: on

5    December 13, 2013, Plaintiff complained of worsening fatigue (AR 336); on March 28, 2016,

6    Plaintiff reported moderate fatigue (AR 333-334); on April 5, 2016, Plaintiff reported being

7    easily fatigued (AR 351); on September 28, 2016, Plaintiff reported moderate fatigue (AR 475);

8    on March 28, 2017, Plaintiff reported severe fatigue (AR 471); on June 28, 2017, Plaintiff

9    reported severe fatigue (AR 468); on August 25, 2017, Plaintiff reported severe fatigue (AR

10   465); on December 28, 2017, Plaintiff reported severe fatigue (AR 462); on June 20, 2018,

11   Plaintiff reported symptoms of fatigue (AR 587); and on July 13, 2018, Plaintiff reported

12   symptoms of fatigue (AR 584).

13        Thus, on March 28, 2017, June 28, 2017, August 25, 2017, and December 28, 2017,

14   Plaintiff expressly reported fatigue at the severe level.  See Belton v. Berryhill, No. 3:15CV1616

15   (DJS), 2017 WL 930820, at *7 (D. Conn. Mar. 9, 2017) ("Although there is medical evidence

16   that Belton experienced fatigue, part B of Listing 14.02 requires 'severe fatigue,' i.e., 'a frequent

17   sense of exhaustion that results in significantly reduced physical activity or mental function.' ").

18   It appears that this could meet the definition of "repeated" under the regulations but, not

19   necessarily given the duration is unspecific in the records.  See 20 C.F.R. Pt. 404, Subpt. P, App.

20   1, § 14.00(I)(3) (term "repeated" means "the manifestations occur on an average of three times a

21   year, or once every 4 months, each lasting 2 weeks or more; or the manifestations do not last for

22   2 weeks but occur substantially more frequently than three times in a year or once every 4

23   months; or they occur less frequently than an average of three times a year or once every 4

24   months but last substantially longer than 2 weeks.").  Significantly however, Plaintiff also

25   repeatedly denied fatigue throughout 2017.  Specifically, on February 9, 2017, Plaintiff denied

26   weight loss and denied fatigue (AR 444); on April 10, 2017, Plaintiff denied weight loss and

27   denied fatigue (AR 439); on July 24, 2017, Plaintiff denied weight loss and denied fatigue (AR

28   435); on September 19, 2017, Plaintiff denied weight loss and denied fatigue (AR 431); on

36

1  October 16, 2017, Plaintiff denied weight change, denied fever, complained of shortness of
2  breath and heartburn, but made no mention of fatigue (AR 425); and on November 6, 2017,
3  Plaintiff denied weight loss and denied fatigue (AR 427).

4       The only other relevant constitutional sign or symptom the Court found exhibited in the
5  record during the time Plaintiff reported severe fatigue in 2017, was reporting of fever.
6  Specifically, on March 28, 2017, August 25, 2017, and December 28, 2017, in addition to the
7  notations of severe fatigue, the review of symptoms state: "fevers Yes."  (AR 463, 466, 472.)
8  However, on these dates, Plaintiff's objective vital signs did not show a fever: on March 28,
9  2017, a temperature of 97.8 degrees was recorded (AR 471), on August 25, 2017, a temperature
10 of 98.0 degrees was recorded (AR 465), and on December 28, 2017, a temperature of 97.8 was
11 recorded (AR 462).[13]  See Fields v. Colvin, No. SA CV 14-1592-KES, 2015 WL 9455567, at
12 *8–9 (C.D. Cal. Dec. 23, 2015) ("The ALJ also noted that Plaintiff's treatment records did not
13 mention fatigue, malaise, or involuntary weight loss, and although Plaintiff sometimes
14 complained of a low-grade fever, it was seldom noted on examination . . . Plaintiff again
15 contends that the ALJ's characterization of the record was inaccurate, but she points to no
16 specific evidence of record to support her contention.").

17      The Court's review also uncovered the following records denying fever, malaise, or
18 weight loss: on April 3, 2014, Plaintiff denied any recent fever, malaise, or involuntary weight
19 change, and was noted as "[f]eeling generally well" (AR 390); on May 22, 2014, Plaintiff denied
20 any recent fever, malaise, or involuntary weight change, and was noted as "[f]eeling generally
21 well" (AR 389, 580); on July 8, 2014, Plaintiff denied fever, denied malaise, and was noted as
22 "[f]eeling generally well" (AR 388); on August 19, 2014, Plaintiff denied fever and denied
23 malaise, and was noted as "[f]eeling generally well" (AR 386); on January 23, 2015, Plaintiff
24 denied fever and malaise, and was noted as "[f]eeling generally well" (AR 385, 576); on
25 December 4, 2015, Plaintiff denied weight loss or fatigue (AR 313); on March 28, 2016, Plaintiff

26 
_____
27 [13]  On September 28, 2016 in addition to moderate fatigue, Plaintiff reported the review of symptoms state: "fevers
   Yes."  (AR 476.)  No temperature was recorded on this day.  On June 20, 2018, in addition to symptoms of fatigue,
28 Plaintiff reported fevers and chills, and had a temperature of 96.7 degrees.  (AR 587.)

1   denied fevers (AR 334); on August 10, 2016, Plaintiff denied weight and denied fatigue (AR

2   456); on September 4, 2016, Plaintiff denied weight and denied fatigue (AR 452); and on

3   December 8, 2016, Plaintiff denied weight loss and denied fatigue (AR 448).

4          As for the first prong of listing 14.09(D) requiring manifestations of at least two of the

5   constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss), the

6   Court finds the ALJ's determination is supported by substantial evidence in the record and is a

7   reasonable interpretation of the evidence.  While it is not absolutely clear that the above records

8   could not be construed in a manner to meet the first prong with records of severe fatigue and

9   fever coinciding in 2017, it is Plaintiff's burden to demonstrate they meet or equal the listing

10  requirements with medical records, and the weight of all these records persuade the Court the

11  ALJ would not be able to find these records establish the first prong, given the ALJ's summary

12  of the medical evidence as a whole, detailed above.  See Duncan v. Berryhill, No. 1:18-CV-

13  00048-LLK, 2019 WL 1139491, at *1–2 (W.D. Ky. Mar. 12, 2019) ("Plaintiff carries the burden

14  of proving that she suffers from a medical impairment satisfying the clinical criteria of a listed

15  impairment, and her burden is strictly construed because the Listing represents an automatic

16  screening in of an impairment as per-se disabling . . . Listing 14.09(D) provides that Plaintiff is

17  per-se disabled if she identifies evidence in the administrative record that required (and not

18  merely allowed) the ALJ to find that the [14.09(D)] clinical criteria are satisfied.") (alteration in

19  original).

20         Further, the Court agrees with Defendant that the record did not show Plaintiff had

21  "marked" limitations in any pertinent area, and that the ALJ properly found Plaintiff had only

22  "mild" limitations in activities of daily living, in maintaining social functioning, and in

23  concentration, persistence or pace.  See Tapia v. Colvin, 520 F. App'x 600, 601 (9th Cir. 2013)

24  ("In order to demonstrate a 'listed impairment' of the relevant mental disorders, Tapia would

25  have had to show 'marked' limitation in functioning, which means 'more than moderate but less

26  than extreme.' "); Melton v. Comm'r of Soc. Sec. Admin., 442 F. App'x 339, 341 (9th Cir.

27  2011).

28         The Court detailed the relevant findings and records above.  The ALJ made specific

findings that Plaintiff was able to carry out activities of daily living and ambulate with ease (AR 24), made detailed findings regarding Plaintiff's reported ability to complete daily activities, maintain social functioning, and ability to complete tasks in a timely manner (AR 26), and specifically found that Plaintiff had a mild limitation in understanding, remembering, or applying information, a mild limitation in interacting with others, a mild limitation in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing oneself (AR 21). See Lewis, 236 F.3d at 512-13 ("An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment . . . [a] boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so," however, the ALJ need not discuss the findings in any specific section of his opinion.).

Plaintiff has not specifically disputed these findings and the Court finds these are clearly reasonable and supported by substantial evidence in the record.  Aside from Dr. Alpern's testimony, Plaintiff has failed to point to any medical evidence disputing such findings, nor does she explicitly argue she has marked limitations as required under the listing.  See Torena O. v. Comm'r of Soc. Sec., No. C20-18-BAT, 2020 WL 2832516, at *2 (W.D. Wash. June 1, 2020) ("Plaintiff fails to establish error because she has not established she meets or equals all of the requirements of Listing 14.09(D).  Specifically, she has not shown she has a marked limitation in one of the following functional areas: activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace . . . The ALJ specifically found Plaintiff had no limitation in social interaction and only a mild limitation as to concentration, persistence, or pace . . . and listed a wide variety of the activities Plaintiff engaged in (Tr. 19).  Plaintiff's opening brief does not point to any particular evidence showing she has a marked limitation in any of the functional areas; her reply brief points only to her own subjective hearing testimony, which the ALJ properly discounted . . . Thus, Plaintiff has failed to meet her burden to show harmful error in the ALJ's finding that she does not meet or equal Listing 14.09(D)."); Chadwell v. Astrue, No. CV 11-568-OP, 2011 WL 4386855, at *6 (C.D. Cal. Sept. 20, 2011) ("In her Reply Brief, Plaintiff asserts that she meets Listing 14 .09(D) . . . However, Plaintiff does not cite to any evidence in the record to support her contention.

1    Moreover, Listing 14.09(D) indicates that an individual must have, *inter alia,* a marked

2    limitation of activities of daily living . . . as the ALJ noted, Dr. Eibschutz opined that Plaintiff

3    was capable of performing activities of daily living, even as her rheumatoid arthritis was 'barely

4    controlled' by medication . . . Plaintiff testified at the hearing that she could 'do all the things

5    that I suppose everybody can do,' although she could not perform them as quickly as before

6    [and] Plaintiff does not contend that she has marked limitations in 'maintaining social

7    functioning' and/or 'completing tasks in a timely manner due to deficiencies in concentration,

8    persistence, or pace.' "); Fields v. Colvin, No. SA CV 14-1592-KES, 2015 WL 9455567, at *8–9

9    (C.D. Cal. Dec. 23, 2015) ("The ALJ also found no evidence in the record to support marked

10   limitations in Plaintiff's ability to perform daily activities, maintain social functioning, or timely

11   complete tasks . . . ALJ noted that although Plaintiff had occasional difficulty with household

12   tasks, she was generally able to care for herself, her two young children, and her home in a

13   satisfactory manner . . . Plaintiff contends that the medical records corroborate her claim of

14   marked limitation in daily activities, but points to no such records."); Duncan v. Berryhill, No.

15   1:18-CV-00048-LLK, 2019 WL 1139491, at *1–2 (W.D. Ky. Mar. 12, 2019)  ("There is no

16   evidence that any medical source opined that Plaintiff has a 'marked' limitation in these

17   functional areas."); Thomas v. Comm'r of Soc. Sec., No. 2:18-CV-108, 2019 WL 642679, at *15

18   (S.D. Ohio Feb. 15, 2019) ("Notably, ALJ Earnhart found only a mild limitation in daily living

19   and moderate limitations in social functioning and in completing tasks in a timely manner due to

20   deficiencies in concentration, persistence, or pace . . . which Plaintiff did not challenge . . .

21   Plaintiff's undeveloped argument therefore does not establish that she meets the symptoms

22   necessary for a finding of equaling Listing 14.09(D).").

23        Further, any error in the ALJ's summary or use of Dr. Alpern's testimony would be

24   harmless.  See Nifong v. Colvin, No. CV 12-07936 AGR, 2013 WL 5310583, at *8 (C.D. Cal.

25   Sept. 20, 2013) ("The ALJ did not expressly address Listing 14.09 in determining that Nifong's

26   severe impairment of rheumatoid arthritis did not meet or equal a listed impairment . . . Instead,

27   the ALJ found that Nifong did not meet or equal Listing 1.02  . . . The ALJ's failure to mention

28   whether he considered Listing 14.09 was not reversible error.  Nifong does not demonstrate that

1   she meets or equals Listing 14.09.  As discussed above, the ALJ relied upon the opinion of Dr.

2   Moazzaz, who found that Nifong could ambulate effectively and could frequently perform fine

3   and gross manipulative movements with both hands . . . Nifong testified that she has a cane, but

4   she 'ha[s]n't had to use it yet.' . . . She also does housework, cooking, shopping and driving . . .

5   In the Reply, Nifong argues that she meets Listing 14.09(D), but she does not contend or

6   demonstrate that she suffers from two of the required constitutional symptoms or signs (severe

7   fatigue, fever, malaise, or involuntary weight loss) or the required marked limitation.  Any error

8   in not considering Listing 14.09 was harmless."); Johnson v. Colvin, No. 14-CV-03096-CMA,

9   2016 WL 8672966, at *2 (D. Colo. Jan. 15, 2016) ("Even an inadequate analysis at step three,

10  however, may constitute harmless error when confirmed or unchallenged findings made

11  elsewhere in the ALJ's decision confirm the step three determination under review.") (citation

12  and quotation marks omitted) aff'd sub nom. Johnson v. Berryhill, 679 F. App'x 682 (10th Cir.

13  2017); Heather O. v. Berryhill, No. 3:18-CV-513-SI, 2019 WL 1922524, at *4 (D. Or. Apr. 30,

14  2019) ("Assuming without deciding that the ALJ's decision in not listing psoriatic arthritis at

15  step two was error, it was harmless at step three as discussed below.  It was also harmless

16  because the ALJ considered Plaintiff's severe and non-severe limitations in evaluating Plaintiff's

17  RFC, although the Court finds that the ALJ properly did not consider Plaintiff's psoriatic arthritis

18  in evaluating Plaintiff's RFC, as discussed below."); Stout v. Comm'r, Soc. Sec. Admin., 454

19  F.3d 1050, 1055 (9th Cir. 2006) (finding "the ALJ provided numerous other record-supported

20  reasons for discrediting the claimant's testimony, which allowed our review to determine the

21  ALJ's error did not materially impact his decision.").

22      Accordingly the Court holds that the ALJ's determination that Plaintiff did not meet or

23  equal any component of listing 14.09, including 14.09(D), is reasonable and amply supported by

24  substantial evidence in the record; that Plaintiff has failed to meet the burden of demonstrating

25  there is medical evidence in the record to affirmatively satisfy the requirements of listing

26  14.09(D); and any error the ALJ may have committed in summarizing or utilizing Dr. Alpern's

27  testimony was harmless to the ALJ's ultimate determination that Plaintiff did not meet or equal

28  any listing, including listing 14.09(D), and would not require remand based on this record.

1

2

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not err in assigning reduced weight to PA-C Pamela Caprioli's opined limitations, and did not commit harmful error in determining Plaintiff did not meet or equal any severity listing, including listing 14.09D. The ALJ's decision is supported by substantial evidence and free of remandable error. Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED. It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Norma Moreno. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   __**November 5, 2020**__

_____
UNITED STATES MAGISTRATE JUDGE